UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD D. ROBESON,

    Plaintiff,

v.

Case No. 09-11231
Hon. Lawrence P. Zatkoff

UNITED STATES STEEL CORPORATION,

    Defendant.

                                                              /

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on September 29, 2011

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Defendant's Motion for Summary Judgment (Docket #18). Plaintiff has filed a response, and Defendant filed a reply. The Court finds that the facts and legal arguments are adequately presented in the parties' papers such that the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. Mich. L.R. 7.1(f)(2), it is hereby ORDERED that the Motion be resolved on the briefs submitted. For the following reasons, Defendant's Motion is GRANTED.

**II. BACKGROUND**

Plaintiff was employed by Defendant United States Steel Corporation ("Defendant"), and its predecessor, Great Lakes Steel Corporation, for over 30 years. Defendant has a collective bargaining agreement with the United Steelworkers of America (the "Union"), and Plaintiff was a

member of the Union. At all times relevant to this action, the collective bargaining agreement in effect was the 2003 Basic Labor Agreement ("2003 BLA"), and the 2003 BLA governed the terms and conditions of employment for all bargaining unit employees for Defendant, including Plaintiff. Plaintiff filed this lawsuit alleging that Defendant breached the 2003 BLA when Defendant wrongfully terminated him. Plaintiff's complaint details various ways that Plaintiff believes the Union breached its duty of fair representation, but the Union is not a party to this action. The undisputed circumstances that form the basis of Plaintiff's lawsuit follow.

When Defendant took over Great Lakes Steel Corporation in May 2003, Plaintiff was provided with various company policies, including: (1) Defendant's Policy on Discriminatory Harassment, (2) Defendant's Policy on Sexual Harassment, and (3) Defendant's General Safety & Plant Conduct Rules and Regulations. Plaintiff admits that he received and read the above policies and rules, and he admits that, in 2005, he received Defendant's Policy on Discriminatory Harassment a second time. . Defendant's Policy on Discriminatory Harassment provides in pertinent part:

> §2. <u>Any act of discriminatory harassment, in any manner or form</u>, is a violation of this Policy and <u>will subject the actor to potential discipline, up to and including suspension or discharge</u> . . . U. S. Steel has a zero tolerance policy for any act of discriminatory harassment.
>
> §5. The term "discriminatory harassment" as used in this policy shall mean:
>
>> §5.1 Epithets, slurs, negative stereotyping, or offensive, intimidating or hostile acts, which are communicated by any means, including voice mail or e-mail, and which relate to race, color, religion, gender, sexual preference, national origin, citizenship, age, physical or mental disability or status as a veteran . . .

Defendant's Policy on Sexual Harassment provides in pertinent part:

> §2 <u>Any act of sexual harassment, in any manner or form</u>, is a violation of this Policy and <u>will subject the actor to potential discipline, up to and including suspension or discharge</u> . . . . U. S. Steel has a zero tolerance policy for any act of discriminatory harassment.
>
> §6 Examples of conduct (which are non-exclusive and hence illustrative only) that would constitute acts of sexual harassment are: (1) sexually based jokes; (2) sexual innuendoes or gestures directed to others . . .

Defendant's General Plant Conduct Rules and Regulations provides in pertinent part:

> SECTION II - <u>The following offenses may be cause for suspension preliminary to discharge</u>:
>
>> §6 . . . [the] use of profane, abusive, or threatening language toward subordinates, fellow employees, or officials of the Company.

On March 12, 2008, Sandy Armstrong ("Armstrong") and Julie Peters ("Peters"), whom Plaintiff knew to be management employees for Defendant, gave a formal Power Point presentation to Plaintiff and many of his co-workers regarding Defendant's policies on Sexual Harassment and Discriminatory Harassment. The next day, Plaintiff called Armstrong during his lunch hour to complain about his foreman. Armstrong did not answer Plaintiff's call, and Plaintiff left a message on Armstrong's voice-mail, asking her to return his call. Believing that he had hung up his phone, Plaintiff then continued speaking with the intention that his comments be heard only by, and for the entertainment of, those present in the lunch room. Unbeknownst to Plaintiff, the call had not been disconnected, and his comments were recorded on Armstrong's voice-mail. Among the remarks

3

made by Plaintiff were:[1]

> I'll elaborate. I'm not interested in Melissa (Sadler, Union Civil Rights Representative) the white nigger. I don't give a fuck about (Marcos Barragan, Local 1299 President). I don't give a fuck about some guy grandstanding like Tommy Holmes, you're not going to do this.
>
> Want to grab a drink?
>
> Remember Tommy, Grandstander, and now she (Ms. Armstrong) says you don't need no union. Fuck the union! Come to me. I got tits, I got pussy. I go fuck! Where's that?
>
> Hey! . . . What are you talking about?
>
> Now when she calls me back. You know what I'm going to do?
>
> Oh big tits chick (Ms. Peters), whenever she calls me back, I'm going to say ah-Sandy, I'm [in] a secluded area, ah, but they don't like us, ah, any phone, is there a way I can meet you somewhere.
>
> Yeah, let's just sit around with our tops off and talk. Alright!!!!!
>
> But hey, you know what though. These guys I've given them all kinds of fucking, all kinds of chances, you heard me on the phone with Barragan, talk with Stapleton (Steve Stapleton, Divisional Griever). I talk to now he says Armstrong to deal with and I'm going to tell her please don't let this guy know who I am cuz he's going to fire me for any kind of reason but you said to come to you and I believe in you. You'll be leaving in two weeks, she said. She's leaving in two weeks. Going down south to fuck some people down there . . . remember? Yes.
>
> But before you can leave can you explain to the chick that fucks black guys (Ms. Peters) that we're being harassed? Ok. Oh Yeah.

---

[1] The monologue is taken verbatim from the minutes prepared by Defendant after Plaintiff's Second Step proceeding. Plaintiff admits that the minutes accurately reflect the comments he made that were recorded on Armstrong's voice-mail. Plaintiff also admitted to his union representatives that it was his voice on the voice-mail recording and that he had in fact had used the racial slur in the voice-mail message.

> Because my deal is . . . is bam, when that schedules up next week, that's all I want. I don't want to fucking work overtime. I can work at the car wash. I got my vacation coming. I got my kids all based around my long weekend. I will deal with doctors and have some fucking doctor say, hey what do you need here? He-he. I had enough of this fucking punk (supervisor).

As a result of Plaintiff's recorded remarks, Defendant issued Plaintiff three separate five-day suspensions, one suspension each for violating: (1) Defendant's Sexual Harassment Policy; (2) Defendant's Discriminatory Harassment Policy; and (3) Defendant's General Safety and Plant Conduct Rules. Each such violation also subjected Plaintiff to discharge.

A preliminary fact finding hearing (a "9B hearing") was held on March 20, 2008. The audio recording of the voice-mail message left by Plaintiff on Armstrong's voice-mailbox, as set forth above, was played at the hearing. At the 9B hearing, Plaintiff's Union representatives were Mike Schock ("Schock") and Steve Stapleton ("Stapleton"), and the Union representatives raised the following defenses on behalf of Plaintiff: (a) Plaintiff was remorseful, (b) Plaintiff had 29 years of seniority, (c) Plaintiff had a good work record, and (d) Plaintiff would be willing to attend counseling. Upon the conclusion of the 9B hearing, Defendant: (a) determined that the Justice & Dignity provision of the 2003 BLA, which allows an employee to continue working during the pendency of the grievance process, would not apply,[2] (b) converted the suspensions to a discharge,

---

[2]The Justice and Dignity clause provides:

> (1) In the event the company imposes a suspension or discharge . . . the affected employee shall remain on the job to which his/her seniority entitles him/her until there is a final determination on the merits of the case.
>
> (2) This paragraph will not apply to cases involving offenses which endanger the safety of the employees of the plant and its equipment, . . .

and (c) immediately terminated Plaintiff. Defendant's determination that the Justice & Dignity provision did not apply was based on its belief that Plaintiff's comments could create a danger at the plant, as discussed in more detail in Section IV.B. below.

Caesar Randazzo ("Randazzo"), the International Staff Representative for the Union, represented Plaintiff after the Second Step proceeding, including at the Third Step proceeding and until Plaintiff's appeal for arbitration was dropped. In representing Plaintiff, the record demonstrates that Randazzo repeatedly raised numerous defenses on behalf of Plaintiff, including: (1) the defenses raised at the 9B hearing, (2) Plaintiff's contention that the comments were not directly communicated to Armstrong, Sadler, Peters or anyone else mentioned in the message, (3) the fact that Plaintiff did not know the comments were being recorded, and (4) that Plaintiff did not intend to harass, or direct profanity toward, anyone. Randazzo also asked Defendant to provide him with the arbitration decisions that Defendant was citing in support of its position that Plaintiff should be discharged. In addition, Randazzo contacted a Union lawyer in Pittsburgh and spoke to that lawyer about the charges against Plaintiff, Plaintiff's position, possible defenses and applicable arbitration cases. Randazzo did not learn of any new defenses that he could raise on Plaintiff's behalf as a result of that conversation.

Defendant's decision to terminate Plaintiff was upheld following the Third Step proceeding. After the Third Step of the grievance process, Randazzo filed an appeal to have Plaintiff's grievance heard by an arbitration board. Under the 2003 BLA, arbitration is the last step of the grievance process, and a decision by the arbitration board is binding on Defendant, the Union and the employee. Randazzo then had additional conversations with Defendant representatives and consulted Plaintiff's attorney. Randazzo even asked a representative for Defendant, Michael

Simpson ("Simpson"), to reconsider Defendant's position regarding Plaintiff's termination because of: (1) Plaintiff's apologies, remorsefulness, years of service, and (2) the fact that Plaintiff did not know his comments were being recorded and did not intend to offend or harass anyone. After Simpson indicated that Defendant would not change its position, Randazzo chose not to proceed with the arbitration and withdrew the appeal. The Union stated that it withdrew the arbitration appeal for the following reasons: (1) the nature and extent of Defendant's policies, (2) the fact that there was a zero tolerance relative to any violation of those policies, (3) the fact that in prior arbitration awards, a claim that a discriminatory comment was made in jest was not sufficient to avoid discharge, and (4) the fact that only the day before leaving the voice-mail message, Plaintiff had attended training on the policies Plaintiff had been found to have violated.

### III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[T]he plain language of Rule 56[] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or;
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot

7

>produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The moving party bears the initial burden of demonstrating the absence of any genuine dispute as to a material fact, and all inferences should be made in favor of the nonmoving party. *Celotex*, 477 U.S. at 323. The moving party discharges its burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004) (citing *Celotex*, 477 U.S. at 325)).

Once the moving party has met its initial burden, the burden then shifts to the nonmoving party, who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## IV.  ANALYSIS

In this action, Plaintiff claims Defendant: (1) wrongfully discharged him under the terms of the 2003 BLA, and (2) wrongfully denied him Justice and Dignity when Defendant did not allow him to continue working pending a final determination on the merits of his grievance.

In order to prevail on either of his claims, Plaintiff must prove that the Union breached its duty of fair representation before he can even attempt to establish a breach of the 2003 BLA by

Defendant. As set forth in the key case describing a union's duty of fair representation, *Vaca v. Sipes*, 386 U.S. 171 (1967), a union's duty of fair representation includes a statutory obligation to serve the interest of all members, without hostility or discrimination towards any members, and to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. *Id.* at 177. A union's obligation involves not only contractual negotiations but also extends to grievance proceedings. *See Airline Pilots Assoc. Intl. v. O'Neill*, 499 U.S. 65, 77 (1991). An employee also must prove that the union's acts "tainted the grievance procedure such that the outcome was more than likely affected by the union's breach and the union's breach" must have had a substantial effect on the outcome. *Dushaw v. Roadway Express Inc.*, *et. al.*, 66 F.3d 129, 132 (6th Cir. 1995), *cert. denied* 517 U.S. 1120 (1996).

Therefore, Plaintiff must establish that, for each claim, it: (a) is meritorious, <u>and</u> (b) was processed by the union arbitrarily or in bad faith. *Vaca*, 386 U.S. at 190-191. It is not enough for an employee to simply show that the claim of unlawful discharge or peremptory termination was meritorious because courts only "insure fair representation, not infallible representation." *See Darin v. General Motors,* 755 F.2d 931, 1985 WL 12849, at *6 (6th Cir. 1985) (citation omitted). In determining whether or not a union's actions were "arbitrary, discriminatory or in bad faith," a plaintiff must show more than mere negligence to substantiate his claim under § 301. *United States Steel Workers v. Rawson*, 495 U.S. 362, 372-73 (1990). In other words, a union is allowed a "wide range of reasonableness" in serving the unit it represents. *Id.* at 374. Therefore, a union's actions are arbitrary only if, in the light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside of the "wide range of reasonableness" as to be irrational. *See Airline Pilots*, 499 U.S. at 78.

9

**A.     Plaintiff's Discharge**

With respect to his claim that he was wrongfully discharged, Plaintiff argues that the Union breached its duty to him because: (1) Union officials did not like him, namely the leaders of the Union who disliked him because he had opposed them on prior campaigns, and (2) the Union "never made any attempt to provide Plaintiff with any defenses whatsoever to his charges."

As to Plaintiff's first argument, *i.e.*, that the Union officials who represented him through the grievance process disliked him and (presumably) did not represent him appropriately for that reason, Plaintiff has offered no evidence how such alleged animosity interfered with the Union's representation of him. First, Plaintiff admitted that Schock held no animosity against Plaintiff. Second, Randazzo testified (as did John Sadvery, Plaintiff's local Union representative("Sadvery")), and Plaintiff has not disputed, that Randazzo was not aware of: (a) any political activities that Plaintiff had participated in, or (b) any animosity by local Union officials toward Plaintiff.

Third, Stapleton was the only Union representative involved in Plaintiff's grievance process about whom Plaintiff complained. In his response, Plaintiff refers to Stapleton as his "union grievance man," and Plaintiff submitted an affidavit, which states, in part:

> 9. Steve Stapleton . . . has stated that he does not like me and has expressed his displeasure over my many criticisms of the union. In 2008 I was part of a team running against the incumbent union officials. I was told that the union officials were unhappy with my comments during the election. I was told by David Prylow[,] a union official[,] that I was wasting my time and the my slate was going to lose and that the union was very unhappy with me. These comments were made only a couple of months before I was asking the union to save my job.
>
> 11. In addition[,] on the tape that led to my firing[,] I said that the union was horrible and that the president of the union[,] Mr. Berrigan[,] was not going to do anything for the members. I also said that Steve Stapleton . . . will not do anything for us.

> 12. It is very clear that the union did almost nothing to help me save my job because of its animosity to me personally. The union failed to present my defenses to the termination.

Plaintiff also submitted the affidavit of Tim Jesky ("Jesky"), a former co-worker,that provides, in part: "It was common knowledge for several years that many of the union officials did not appreciate [Plaintiff's] criticism of the union. I know that he and Steve Stapleton[,] who was the grievance man for the union[,] did not get along for several years before [Plaintiff] was fired." Even assuming Plaintiff's and Jesky's statements are true, however, Plaintiff has not offered any argument or theory about <u>how</u> this animosity compromised the Union's representation of him. Significantly, the record reveals that Stapleton represented Plaintiff only at the 9B hearing and that, thereafter, Schock and Randazzo handled Plaintiff's grievance. Plaintiff has not offered any evidence that Stapleton (or any other Union official) interfered with, directed or otherwise influenced the representation by Schock, Randazzo or any other Union official. Fourth, as discussed below, the Court finds that the Union's behavior cannot be said to be so far outside "the wide range of reasonableness" as to be irrational. *Airline Pilots, supra*.

As to Plaintiff's second argument *(i.e.*, the Union failed to present his defenses to the discharge), the record demonstrates otherwise. The Union grieved Plaintiff's termination throughout the various stages of the grievance process. As noted above, Plaintiff initially was represented by Schock (at both the 9B hearing and the Second Step proceeding, held on April 10, 2008) and Stapleton (at the 9B hearing only). At the 9B hearing, those Union representatives raised the following defenses on behalf of Plaintiff: (a) Plaintiff was remorseful, (b) Plaintiff had 29 years of seniority, (c) Plaintiff had a good work record, and (d) Plaintiff would be willing to attend counseling.

11

Randazzo began representing Plaintiff after the Step Two decision was rendered. The undisputed evidence reflects that, at the Third Step proceeding, the following arguments were presented on Plaintiff's behalf: (1) the defenses raised at the 9B hearing, (2) Plaintiff's contention that the comments were not directly communicated to Armstrong, Sadler, Peters or anyone else mentioned in the message, (3) the fact that Plaintiff did not know the comments were being recorded, and (4) that Plaintiff did not intend to harass, or otherwise direct profanity toward, anyone. In the course of his representation of Plaintiff, Randazzo: (a) asked Defendant to provide arbitration cases to support its position, and (b) contacted the Union's lawyer in Pittsburgh about Plaintiff to ascertain whether there any other arguments or defenses Randazzo could make on Plaintiff's behalf. In addition, after Plaintiff was denied reinstatement following the Third Step proceeding, Randazzo filed an appeal to arbitration to keep Plaintiff's grievance active.

The Court notes that, under the 2003 BLA, the Union has the discretion whether to appeal a case to arbitration, so long as the Union looks to all of the facts and merits of the case in order to determine whether or not there is any chance for success. *See* 2003 BLA, Art II § A(2), page 9. If the Union has done so, case law dictates that the Union did not breach its duty of fair representation. *See, e.g.*, *Kelsey v. Formtech Indust.*, 305 Fed.Appx. 266 (6th Cir. 2008) (affirming the grant of summary judgment in favor of a union where it did not pursue a grievance on its members behalf). In *Kelsey*, the court concluded that the withdrawal of a grievance by the union was not arbitrary, discriminatory or in bad faith where: (a) the union had conducted an investigation into the allegations made by plaintiff, and (b) based on the investigation, the union concluded that there was just cause for the discharge and that the grievance lacked merit.

Before the Union elected to drop Plaintiff's appeal to arbitration, Randazzo had further

discussions with Defendant's representatives and Plaintiff's legal counsel. Randazzo again asked Simpson to consider: (1) Plaintiff's apologies, (2) the fact that Plaintiff was remorseful, (3) Plaintiff's years of service, and (4) the fact that Plaintiff did not know his comments were being recorded and did not intend to offend or harass anyone, all in an attempt to get Defendant to reduce the penalty assessed against Plaintiff. In other words, the Union elected to drop the appeal to arbitration only after Randazzo (and other Union personnel) reviewed the cases provided by Defendant and Randazzo's conversations with Simpson made it clear that Defendant would not agree to reduce the penalty imposed on Plaintiff. In fact, according to Randazzo, and no evidence has been offered to the contrary, the decision not to continue to pursue the appeal to arbitration was made only after taking into consideration: (1) the nature and extent of Defendant's policies, (2) the fact that there was a zero tolerance relative to any violation of those policies, (3) the fact that in prior arbitration awards, a claim that a discriminatory comment was made in jest was not sufficient to avoid discharge, and (4) the fact that only the day before leaving the voice-mail message, Plaintiff had attended training on the policies he violated.

      Based on the uncontested actions taken by the Union with respect to its representation on behalf of Plaintiff related to the propriety of Plaintiff's discharge, the Court concludes that the Union's behavior was not so far outside the "wide range of reasonableness" as to be irrational. *Airline Pilots, supra.* Accordingly, and for the reasons stated above, the Court finds that, as a matter of law, none of the foregoing behavior by the Union could be classified as "arbitrary, discriminatory or in bad faith." The Court therefore concludes that Plaintiff has failed to offer evidence that the Union breached its duty of fair representation of Plaintiff with respect to the propriety of the reason(s) for his discharge.

**B.     Plaintiff's Peremptory Termination**

Plaintiff also claims that he had a right to work under the 2003 BLA until a final determination was made with respect to his grievances. As noted above, the "Justice and Dignity" clause provides that an employee shall remain on the job until the grievance process has been fully determined, unless the case involves "offenses which endanger the safety of the employees at the plant and its equipment, . . ." Plaintiff argues that the Union breached its duty with respect to this process because the Union allowed Defendant to fire him immediately, in violation of the 2003 BLA. Plaintiff contends that Defendant "never charged [him] with creating a dangerous situation. [Defendant] never filed any claims that Plaintiff created a dangerous situation. . . . It is submitted that [Defendant] did not take Plaintiff's questionable joking with his lunch mates as creating a dangerous situation."

Defendant responds that, in this situation, as in published cases, Plaintiff's comments (namely, the racial comments) "could have created a dangerous situation and that [Defendant's] management had it within their rights and in fact obligation, to discharge [Plaintiff] immediately to avoid a potentially dangerous situation." Defendant directs the Court to several arbitration cases it provided to, and reviewed by, Randazzo and Sadvery. Plaintiff contends that all of the arbitration cases provided to him by the Union involved: (1) racial comments made directly to another person, and (2) a physical or verbal confrontation, neither of which was present here.

Once again, Plaintiff's argument ignores the record. First, the Union challenged Defendant's denial of Justice and Dignity for Plaintiff through the Third Step proceeding. Second, there is no evidence that the Union's decision not to continue to pursue the appeal to arbitration was not arbitrary, discriminatory or in bad faith. Significantly, no later than the issuance of the Second Step

Minutes following the April 10, 2008 Second Step proceeding, the Union and Plaintiff were aware of a similar situation that had occurred at a Defendant plant, a situation that was also covered by the 2003 BLA. As set forth in the Second Step Minutes, Defendant terminated an employee immediately (*i.e.*, by denying Justice and Dignity) after learning that such employee had made a racial comment, allegedly in a joking manner, to another worker (who was not the subject of the racial comment). As set forth in the Second Step Minutes, in that 2005 case, Defendant's former employee filed a grievance after he was discharged from Defendant for referring to an African-American co-worker as a "lazy nigger" when "joking around with two African American co-workers whom he claimed frequently used the N-word. . . . [When] the comment was relayed to [another] employee by one of the co-workers who heard it[,] [t]he employee was highly offended an oral altercation ensued." The termination and the denial of Justice and Dignity for that employee were upheld by the Board of Arbitration ("Board"). As set forth in the Second Step Minutes, the Board recognized:

> the use of the "N" word as commonly known to be "inflammatory and an incitement to violence for which the Company might be held liable." The Board noted, "In light of the risk of violence presented in these cases, the denial of Justice and Dignity was appropriate."

*See* Exhibit F to Defendant's Motion (Second Step Minutes). *See also* Exhibit M to Defendant's Motion, at p. 15 (Board of Arbitration Case Nos. USS-44,578; 44,579 (July 18, 2005)).

The Court finds that the underlying facts of the instant case parallel those of the 2005 case, even though the verbal confrontation did not occur here. As recognized by the Board, the use of a racial epithet such as the one Plaintiff uttered in this case is known to be "inflammatory and an incitement to violence for which [Defendant] might be held liable." As such, there is no prerequisite that Defendant wait until a confrontation occur to deny an employee Justice and Dignity under the

15

2003 BLA.  Thus, it is clear that, after the Second Step Minutes were issued (if not before then), the Union was aware of the Board's position regarding the right of Defendant to deny an employee Justice and Dignity in a case such as this one.  Thus, the Court finds that it was reasonable for the Union to conclude that pursuing Plaintiff's claim for denial of Justice and Dignity was not worth presenting to the Board.  Accordingly, the Court also concludes that the Union's failure to pursue Plaintiff's grievance to the point of obtaining a determination from the Board was not a decision that: (1) was "arbitrary, discriminatory or in bad faith[,]" or (2) so far outside the "wide range of reasonableness" so as to be irrational.  The Court therefore concludes that Plaintiff has failed to satisfy his burden of demonstrating that the Union breached its duty to Plaintiff when it dropped Plaintiff's appeal to arbitration.

**C.     Conclusion**

For the foregoing reasons, the Court concludes that, as a matter of law, (1) Plaintiff cannot prevail on any of his claims before this Court, and (2) Defendant's Motion for Summary Judgment must be granted.

**V.  CONCLUSION**

Accordingly, and for the above reasons, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Docket #18) is GRANTED.  Plaintiff's cause of action is therefore DISMISSED WITH PREJUDICE.  Judgment shall be entered accordingly.

IT IS SO ORDERED.

                                            s/Lawrence P. Zatkoff
                                            LAWRENCE P. ZATKOFF
                                            UNITED STATES DISTRICT JUDGE

Dated: September 29, 2011

## CERTIFICATE OF SERVICE

    The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on September 29, 2011.

                                                      s/Marie E. Verlinde
                                                      Case Manager
                                                      (810) 984-3290